IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IMANI NEWCOMER, | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. 8:24-cv-00562-PX |
| MOM'S ORGANIC MARKET, INC., | * | |
| Defendant. | * | |
|  | *** | |

**MEMORANDUM OPINION**

Plaintiff, Imani Newcomer ("Newcomer") accuses her former employer, Defendant's MOM's Organic Market, Inc. ("MOM's") of race, color and gender discrimination, hostile work environment, and retaliation. Pending before the Court is MOM's motion to dismiss the Complaint. ECF No. 11. The issues are fully briefed, and the Court finds no hearing necessary. *See* D. Md. Loc. R. 105.6. For the reasons stated below, MOM's motion to dismiss is granted in part and denied in part.

**I.    Background[1]**

   **A.    The Complaint Defects**

Before summarizing the Complaint facts, the Court addresses certain fundamental problems with the pleading. The Complaint exceeds the allowable page limits by nearly fourteen pages without leave of this Court. *See* D. Md. Loc. R. 103.1(d) ("Pleadings . . . shall not exceed forty (40) pages in length."). Accordingly, the Court could refuse to accept the Complaint and require refiling it in accordance with this Court's Local Rules. *See Gross v. SES Americom, Inc.*, 225 F.R.D. 169, 170 (D. Md. 2004), *modified*, No. CIV.A. RWT 03-102, 2004 WL 3167997 (D.

---

[1] The Court takes the Complaint facts as true and most favorably to Plaintiff, Imani Newcomer, as the nonmovant. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

1

Md. Nov. 23, 2004) (requiring parties to refile motions that exceeded the Court's page limitation). While the Court will not do that, it will also not tolerate any further violations of the Local Rules.

Especially in this case. The fifty-four-page Complaint presents as a largely misdirected effort to discuss the ills of discrimination writ large without sufficient attention paid to those allegations that support Newcomer's claims. For example, the pages Glassdoor reviews about MOM's as chronicled in the pleading utterly fail to make plausible how the company discriminated against Newcomer. ECF No. 1 ¶ 4; *cf. SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-CV-01468-WJM-BNB, 2014 WL 1319361, at *5 (D. Colo. Apr. 2, 2014); *Doe v. Kamehameha Sch.*, 2008 WL 5423191, *4 (D. Haw. Dec. 31, 2008) (explaining that on-line reviews are of little probity as they often are a collection of "outrageous, offensive, and even nonsensical statements" cloaked in anonymity). Likewise, discriminatory acts taken against other employees, even in Newcomer's presence, do not advance Newcomer's claims of discrimination against her. Because the Court will permit Newcomer to amend the Complaint for the reasons discussed below, Newcomer is cautioned that the inclination to reach far and wide for anything that remotely casts MOM's in an unfavorable light does little to make her claims plausible.

### B. Alleged Facts

Nearly eight years ago, in October of 2017, Newcomer, a Black woman, began working at MOM's Jessup, Maryland store as an "Associate/Team Member." ECF No. 1 ¶ 18. She was supervised by General Manager David Wiggins. *Id.* ¶ 20. In May of 2018, Newcomer was promoted to Manager-in-Training and was paid $17 per hour. *Id.* ¶¶ 22–27. With the

promotion, Newcomer was responsible for forty-five staff members and regularly was the only supervisor in the store.  *Id.*

From May 2018 to the end of 2019, Newcomer repeatedly asked Wiggins about when she would be promoted to Assistant Manager, but Wiggins never gave her a straight answer.  *Id.* ¶¶ 30–32.  During this time, MOM's promoted several White men to management positions.  *Id.*  However, Newcomer did receive a $0.75 per hour raise in October 2019, although a White woman was making more than Newcomer for the same position.  *Id.* ¶ 33.

Newcomer learned that Wiggins had sexually harassed two non-binary and/or transgender staff members.  *Id.* ¶ 28.  A third female employee also complained that she had been sexually assaulted by a male employee.  *Id.* ¶ 29.  Newcomer asked for a transfer, which was granted.  *Id.* ¶¶ 30–37.  She started working at the College Park MOM's location in January 2020.  *Id.*

At the College Park store, Lara McCallum was the Regional Manager and Kyle Young was the General Manager.  *Id.* ¶ 38.  On a weekly basis, Young would talk disparagingly about Black and Hispanic customers, calling them "ghetto," "trashy," "low-class," and "too poor."  *Id.* ¶ 40.  Young would also "prioritize" the preferences of White employees over employees of color, although the Complaint provides few factual details about how Young would do this.  *Id.* ¶ 42.

On November 19, 2020, Young terminated a minority employee, Jane Doe, because she did not show up for work.  *Id.* ¶ 48.  And yet when Hannah Moore, a White female employee, did not show up for work three days later, Young did nothing.  *Id.* ¶ 51.  As to what, if anything, Young did to Newcomer, she alleges that around December 13, 2020, Young failed to respond appropriately when she was threatened by a customer.  *Id.* ¶¶ 55–59.  Newcomer submitted a

3

related incident report to Young and McCallum, who did nothing in response, even though MOM's "promptly" addressed other complaints that White employees submitted. *Id.* Again, the Complaint is devoid of any detail as to who among the White employees had submitted complaints and how MOM's had addressed them.

In December 2020, Stacie May, a White woman, became the Assistant General Manager at College Park, receiving a $100,000 per year salary. *Id.* ¶¶ 60–62. May would speak to Hispanic employees in "broken English," and act in a demeaning manner toward minority customers and employees. *Id.* ¶¶ 68–72. May also was "touchy," with employees of color more than with White employees. *Id.* ¶¶ 75–77. But again, the Complaint offers few details as to May's alleged discriminatory conduct toward Newcomer. When Newcomer objected to being "touched," May responded that touch is "how [she] communicate[s]." *Id.* May also referenced certain unnamed tasks as "man's work." *Id.* ¶ 74.

On January 7, 2021, Young met with Newcomer for her performance evaluation. *Id.* ¶¶ 78–82. Although Newcomer's review was "overwhelmingly positive," Young did describe her as "too strict" regarding customer returns. *Id.* Nonetheless, according to Young, Newcomer was "close" to receiving a promotion to Assistant General Manager. *Id.*

Evidently in January of 2021, May's touchiness escalated. May approached Newcomer, who was seated, and put her in a choke hold. *Id.* ¶ 83. Newcomer communicated to May that she did not wish to be touched in that manner. *Id.* ¶ 84. Young observed the incident but did not intervene. *Id.* ¶ 85.

Later that month, Newcomer also told May that several employees had complained about May's treatment of employees of color, with one employee saying that she no longer wanted to work with May. *Id.* ¶¶ 92–95. May responded that the complaining employees are "wolves,"

and that the complaints can be chalked up to an "Angry Black Woman" issue. *Id.* ¶ 96. Newcomer objected to May's use of such derisive terms, and May responded that Newcomer was "one of them," so it made sense that Newcomer, too, would "attack[]" her. *Id.* ¶ 98. May put Newcomer into a choke hold again during the first week of February, and then again in May, each time over Newcomer's objections. *Id.* ¶¶ 108 & 148–49.

Newcomer next met with Young to report her concerns about May's racist comments and offensive touching of Black and Hispanic employees. *Id.* ¶ 103. Young told Newcomer that the issues she raised were a "Human Resources ("HR") matter," but he did not involve HR. *Id.* ¶¶ 105–07.

On February 11, 2021, Newcomer met with McCallum to discuss her career trajectory. *Id.* ¶¶ 110–11. She had been in the Manager-in-Training position for nearly three years and wanted to advance. *Id.* McCallum described her as an "excellent employee and manager" but expressed concern about the December 2020 incident involving a negative customer interaction. *Id.* ¶ 112. McCallum asked whether Newcomer would be willing to transfer stores to receive a promotion. *Id.* ¶ 115. Newcomer replied that she was only open to transferring to the Washington, D.C. and Bowie, Maryland locations because of transportation constraints. *Id.* In the same meeting, Newcomer reported May's unwanted touching and demeaning communications. *Id.* ¶¶ 117–19. McCallum appeared unconcerned and said, "[w]ell, maybe you should change how you look at the situation." *Id.* ¶ 120. McCallum also suggested that Newcomer had taken May's comments "out of context." *Id.* McCallum did say, however, that she would "look into it." *Id.* ¶ 122.

On February 18, 2021, the College Park store was hit with a large snowstorm. *Id.* ¶¶ 123–26. Newcomer was one of only a few employees who worked that day, pulling a fourteen-

hour shift. *Id.* Young and other employees refused to brave the storm, so Newcomer requested that McCallum close the store early. *Id.* McCallum initially rejected the request because the store was "making too much money." *Id.*

On March 3, 2021, Newcomer was promoted to Assistant General Manager and given an annual salary of $40,000. *Id.* ¶ 130. After salary negotiations, Young raised Newcomer's pay to $48,000 a year. *Id.* ¶ 134. Newcomer questioned why May was paid $100,000 annually for the same position as her. *Id.* ¶ 132. Young cited May's prior experience as the reason for the discrepancy. *Id.* ¶ 136.

On March 12, 2021, someone reported to Newcomer that Joshua Maynard, a White male employee, had taken food from the store without paying for it. *Id.* ¶ 141. Newcomer asked that Young issue Maynard a disciplinary notice. *Id.* ¶ 143. Young refused even though he had issued the same notice to a female employee of color for the same misconduct. *Id.* ¶ 145. Maynard also called a White female employee "stupid," and again Young did nothing. *Id.* ¶¶ 150–56. The next month, Maynard sent harassing text messages to a female supervisor and again received no discipline. *Id.* ¶¶ 157–59.

On March 20, 2021, May had a verbal altercation with a customer, which Newcomer reported to Young. *Id.* ¶ 160. Young met with Newcomer and May in hopes of improving their working relationship. *Id.* ¶ 162. May told Young that Newcomer and her "pack of wolves" were "coming after her" because she is a White woman. *Id.* ¶ 165. Newcomer told Young that many employees did not appreciate May's conduct. *Id.* ¶ 166. May responded that she saw no problem with her management style and refused to change. *Id.* ¶ 168. Newcomer asked Young to involve HR to which he replied that they were "handling the situation" already. *Id.* ¶¶ 170–71.

On March 23, 2021, Newcomer contacted HR to tell them about May. *Id.* ¶ 172. HR never responded directly to Newcomer but a representative did meet with employees in the College Park store. *Id.* ¶¶ 173–75. However, the representative chose to conduct those meetings in the open lounge area where there was neither privacy nor anonymity which, in Newcomer's view, discouraged candor. *Id.*

By the end of March 2021, Young grew increasingly antagonistic toward Newcomer. *Id.* ¶ 176. Young only gave the most undesirable manager shifts of 3:00 AM to 11:00 AM, or 4:00 AM to 12:00 PM, to Newcomer despite Newcomer's requests for different work times. *Id.* ¶¶ 178–80. On one occasion, Young scheduled a "work installation" without telling Newcomer, requiring her to work fifteen hours straight. *Id.* ¶ 181.

On March 27, 2021, a Black employee told Newcomer that a senior team member was bullying her. *Id.* ¶ 184. Newcomer asked the employee to write a statement. *Id.* ¶ 185. The employee declined, so Newcomer told Young about the incident. Young, in turn, reported the events to HR. *Id.* ¶ 186. The same employee asked to be transferred to another store, which was declined. Then, the employee screamed at Newcomer when asked to perform a task and would not follow Newcomer's directives. *Id.* ¶¶ 191–95. Newcomer reported the incident to Young and HR but received no response. *Id.* ¶ 196. A couple weeks later, the same employee yelled and swore at Newcomer. *Id.* ¶ 202. Young suggested that Newcomer modify her work schedule to avoid working with the employee and asked if she would be willing to transfer to a separate store. *Id.* ¶¶ 203–05. When Newcomer declined the transfer, Young assured her that she would not be terminated for her decision. *Id.* ¶ 207.

A month later, on April 4, 2021, a female employee reported to Newcomer that a male employee, Andrew Newman, had thrown her up against the wall, grabbed her face, and

7

forcefully kissed her. *Id.* ¶ 197. The woman rejected Newman's advances. *Id.* Newman later warned the woman, "If you tell anyone what happened, I'll know, because you know who my family is in this company." *Id.* ¶ 199. Ultimately, Newman was terminated. *Id.* ¶ 201.

Around the same time, McCallum and Director of HR, Patrice Kotler, met with Newcomer to tell her that both May and a separate employee had complained of Newcomer's discriminatory acts and bullying, respectively. *Id.* ¶¶ 212–16. McCallum told Newcomer that she would be required to transfer "immediately" to the Rockville store or relinquish her management position. *Id.* ¶¶ 220–22. Newcomer thereafter told Young she was concerned that she would be fired for reporting May's discriminatory and harassing behavior to HR. *Id.* ¶ 229. Young acknowledged their precarious situation and believed that either one would be demoted to take the blame for the store's problems. *Id.* ¶ 230.

Around the same time, another employee, Noah Perry, complained about May's physicality with staff. *Id.* ¶ 223. Newcomer promptly reported Perry's complaint to Young, McCallum, and HR, but once again received no response. *Id.* ¶ 225.

On April 22, 2021, Newcomer met with two additional HR representatives as well as McCallum, and Young. *Id.* ¶ 233. During that meeting, the HR representatives reported that after investigation, complaints against Newcomer were substantiated; that *she* was the "problem" because she did not "fit the mold" of a manager; and that she was the source of "toxicity," in the store. *Id.* ¶¶ 234–36. McCallum then offered Newcomer to transfer to the Rockville store, which she declined. *Id.* ¶ 244. In response, McCallum informed her that MOM's intended to "part ways" with her. *Id.* ¶ 246. Newcomer asked for the stated grounds for her termination and was met with silence. *Id.* ¶ 247.

Based on these events, Newcomer filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 10, 2022.  *Id.* ¶ 16.  The EEOC issued Newcomer a right-to-sue letter on November 30, 2023, and she filed this suit on February 23, 2024.  ECF No. 1.  Newcomer alleges that MOM's has discriminated and retaliated against her on account of her race, color and gender, and created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII") as amended, as well as companion race-based claims under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").  Lastly, she claims that MOM's violated the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), in paying her comparatively low wages.  MOM's now moves to dismiss the Complaint entirely.

## II.     Standard of Review

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff.  *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir. 1997).  To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  The Court must be able to deduce "more than the *mere* possibility of misconduct"; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief.  *See Ruffin v. Lockheed Martin* Corp., 126

9

F. Supp. 3d 521, 526 (D. Md. 2015) (quoting *Iqbal*, 556 U.S. at 679), *aff'd in relevant part*, 659 F. App'x 744 (4th Cir. 2016).

### III.  Analysis

#### A.  Discrimination Claims under Title VII (Count IV) and Section 1981 (Count I)

Race discrimination claims may be brought, as Newcomer has alleged, under Title VII and Section 1981.  The elements for violations under both statutes are identical.  *See Bowling v. Humanim, Inc.*, No. JKB-16-3298, 2017 WL 713862, at *2 (D. Md. Feb. 22, 2017) ("In the employment context, courts analyze claims of racial discrimination brought under § 1981 according to the same requirements as those brought under Title VII of the Civil Rights Act of 1964.") (citing *Gairola v. Va. Dept. of Gen. Serv.*, 753 F.2d 1281, 1285 (4th Cir. 1985)).  Likewise, because the Title VII gender discrimination claim is analyzed under the same framework as the race claims, the Court will assess the sufficiency of all discrimination theories together.[2]

The parties first dispute whether Newcomer has plausibly averred direct evidence of discriminatory intent.  ECF No. 12 at 8; ECF No. 17 at 3.  Direct evidence is "evidence from which no inference is required."  *Willacy v. Baltimore Police Dep't,* No. DLB-21-3162, 2022 WL 3700875, at *3 (D. Md. Aug. 26, 2022) (quoting *Holley v. N.C. Dept. of Admin., N.C.*, 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012)).  Where the Complaint includes allegations of direct discrimination, the plaintiff need only make plausible that the discriminatory acts adversely affected the terms or conditions of employment.  *See Hammoud v. Jimmy's Seafood, Inc.*, 618 F.

---

[2] MOM's rightly contends that the alleged misconduct at the Jessup location is barred by limitations.  ECF No. 12 at 13.  Newcomer does not dispute this point, and further clarifies that she included the Jessup events as pertinent only to her hostile work environment claim.  ECF No. 17 at 15–16.  Although it is true that conduct outside the limitations period may support the existence of a hostile work environment, *see Gilliam v. S.C. Dep't of Juv. Just.*, 474 F.3d 134, 140 (4th Cir. 2007), the Complaint does not currently make plausible any such connection.  The allegations concerning each store do not involve any of the same individuals or incidents.  If Newcomer amends her complaint, she must cure this deficiency or eliminate the Jessup allegations altogether.

10

Supp. 3d 219, 234 (D. Md. 2022). But where the Complaint does not include allegations of direct discrimination, the Court employs the well-known burden-shifting framework announced in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Bowling v. Balt. City Bd. of Sch. Comm'rs*, No. ELH-15-3431, 2017 WL 713862, at *2 (D. Md. Feb. 22, 2017); *see also Macedo v. Elrich*, No. 20-3006-PX, 2021 WL 4391124, at *5 (D. Md. Sept. 24, 2021); *Sillah v. Burwell*, 244 F. Supp. 3d 499, 511 (D. Md. 2017). Under this framework, the plaintiff must make a prima facie showing that (1) she belonged to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not a member of her protected class received more favorable treatment. *See White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 295 (4th Cir. 2004). If the plaintiff makes that showing, the burden shifts to the employer to assert a legitimate, nondiscriminatory reason for its conduct. *McDonnell Douglas Corp.*, 411 U.S. at 802, and then the burden shifts back to the plaintiff to show that the stated rationale is a pretext for discrimination. *See Foster v. Summer Vill. Cmty. Ass'n, Inc.*, 520 F. Supp. 3d 734, 742 (D. Md. 2021) (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001)).

Newcomer contends that May's reference to her as an "Angry Black Woman" and her putting Newcomer in a choke hold amounts to direct evidence of discriminatory intent. ECF No. 17 at 3. Viewing the facts most favorably to Newcomer, the Court cannot agree. Merely putting hands on a person, even in this context, does not amount to evidence of discrimination. Nor can May's use of the term "Angry Black Woman," alone suffice. This is because even if the statement "reflect[s] a discriminatory attitude," it does not amount to "direct evidence of discrimination" unless linked to the claimed adverse employment action. *E.E.O.C. v. CTI Glob. Sols., Inc.*, 815 F. Supp. 2d 897, 908 (D. Md. 2011).

Here, the only plausible adverse employment action supporting the discrimination claim is Newcomer's termination. Nothing makes plausible how May was involved, directly or indirectly, in that decision. Thus, even if the Court assumes the "Angry Black Woman" comment is discriminatory in nature, its intent was not aimed at Newcomer's termination or any other adverse employment action that Newcomer claims she experienced.

Newcomer, in response, presses that *Elries v. Denny's, Inc.* compels a different outcome. 179 F. Supp. 2d 590, 594 (D. Md. 2002). There, the Court agreed with plaintiff that the employer's comment about "get[ting] rid of all the Arabs" was plausibly linked to plaintiff's termination that followed on the heels of this comment. *Id.* at 597. By contrast, May had nothing to do with HR and management's decision to terminate Newcomer, and so the same direct connection to the discriminatory intent is missing. The Court will thus assess the sufficiency of the claim under the *McDonnell Douglas* standard.

On this score, MOM's first contends that because the Complaint facts show Newcomer had not been meeting her employer's expectations at the time she was fired, she cannot make plausible the prima facie case. ECF No. 12 at 16. This is so, says MOM's, because even though Newcomer avers to having received a "[s]tellar [p]erformance [e]valuation" in January 2021 (ECF No. 1 ¶ 79), she also avers that her reviewers gave her critical feedback about an unfavorable customer interaction, her deteriorating relationship with Young, and the complaints lodged against her. *Id.* ¶¶ 80 & 243.

The problem for MOM's, however, is at the pleading stage, none of the other incidents undermine that Newcomer had received a "stellar" performance evaluation. Meeting employer expectations is not synonymous with perfection, as MOM's suggests. Nor did such alleged performance issues stop MOM's from promoting Newcomer just one month before she was

fired.  This promotion certainly makes plausible that Newcomer had been meeting expectations and was terminated nonetheless.  Thus, the claim will not be dismissed on this basis.

MOM's next argues that Newcomer fails to aver sufficient facts to demonstrate that she had been treated adversely when compared to similarly situated employees outside her protected classes.  ECF No. 12 at 18.  To be sure, the Complaint alleges broadly that MOM's treated Newcomer "differently from (and less preferably than) similarly situated, White, male employees."  ECF No. 1 ¶ 279.  With no factual detail, Newcomer avers that MOM's disciplined white employees less frequently, promoted them faster, and paid them better than it did employees of color.  *Id.*  But overbroad generalizations of hypothetical employees, without more, will not suffice.  *See Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012) (explaining that a disparate treatment claim fails when complaint's allegations regarding comparators "do[es] not rise above speculation.").

That said, a plaintiff is not constrained to averring detailed comparator evidence at the pleading stage.  So long as some facts nudge the claim from possible to plausible, the Court will not dismiss it.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Even so, the claim still fails because none of the alleged instances of discrimination against Newcomer are plausibly tied to any particular adverse employment action taken against her.  No doubt, the Complaint cites a litany of awful things that happened at MOM's, sometimes to Newcomer and sometimes to other employees.  Some incidents appear race- or gender-based and others do not.  Because the pleading fails to make plausible which claimed discriminatory acts were leveled against Newcomer, or how such acts were tied to the adverse action taken against her—whether it be her

termination, lack of promotion, or a comparatively low hourly rate—the claims fail and must be dismissed.

The Court next turns to Newcomer's hostile work environment allegations.

### B. Hostile Work Environment in Violation of Title VII (Count V) and Section 1981 (Count II)

MOM's argues that the hostile work environment claims must be dismissed for two reasons. First, that the Complaint includes no facts that Newcomer experienced unwelcome conduct on account of her race, color or gender. Second, that the alleged unwelcome conduct was not sufficiently severe and pervasive to have altered the terms and conditions of Newcomer's employment. ECF No. 12 at 15–20. For a hostile work environment claim to survive challenge, some facts must make plausible that the plaintiff (1) experienced unwelcome conduct, (2) that was imputable to the employer, (3) that the conduct was aimed at a protected characteristic, and (4) was sufficiently severe and pervasive to alter the conditions of her employment. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 299 (4th Cir. 2015). Importantly, the alleged course of conduct must be "objectively 'severe or pervasive,'" when considering the totality of the circumstances. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). This includes considering the "frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

As the gravamen of the claim, Newcomer points to May's conduct; namely, her "offensive touching by a manager who *explicitly stated* her racial animus towards them." ECF

14

No. 17 at 17 (emphasis in original).  The Complaint identifies three times that May placed Newcomer in an unwelcome choke hold.  ECF No. 1 ¶¶ 83, 108 & 148.  The Complaint also describes how May called Newcomer and her presumably Black colleagues a pack of "wolves" with an "Angry Black Woman" issue, suggesting that the Black women on staff were targeting her, a White woman—an assertion that May appeared to offer as a pretext for why she was reported.  *Id.* ¶ 96.

But again, the Complaint fails to tie the acts of physical aggression to any racial or gender-based animus directed at Newcomer.  Although the Court "may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race," *Sunbelt Rentals*, 521 F.3d at 318, nothing links the choke hold incidents to May's view of Newcomer as an "Angry Black Woman."  While the choke hold incidents are disturbing and should not be tolerated in any work environment, the events are so ill-pleaded that the Court cannot conclude they are plausibly connected to Newcomer's race, color or gender sufficient to infer that Newcomer experienced a hostile work environment on account of her protected characteristics.  The hostile work environment claims are dismissed.[3]

### C. Retaliation in Violation of Title VII (Count VI) and Section 1981 (Count III)

For the retaliation claims to survive challenge, the Complaint must make plausible that Newcomer engaged in activity protected by Title VII or Section 1981; that her employer took an adverse employment action against her; and that the two are causally connected.  *Jenkins v.*

---

[3] Although the Court does not reach MOM's alternative argument that the Complaint fails to sufficiently hostile work environment, May's penchant for putting her arms or hands around employees' throats is deeply troubling.  On a most basic level, no employee should have to tolerate being assaulted by her supervisor.  So, while May's assaultive acts could be enough to render the work environment sufficiently hostile, the claim still fails because no other facts connect those acts to Newcomer's race, color or gender.

*Gaylord Ent. Co.*, 840 F. Supp. 2d 873, 880 (D. Md. 2012) (quoting *Tasciyan v. Med. Numerics*, 820 F. Supp. 2d 664, 675 (D. Md. 2011)).  MOM's argues that Newcomer has failed to allege any facts as to the first and third elements.  ECF No. 12 at 27–28.  The Court considers each in turn.

As to the first element, "protected activity" includes opposition to an unlawful employment practice, or an employment practice an employee believes to be unlawful. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416–17 (4th Cir. 2015).  Accordingly, the facts must make plausible that Newcomer reasonably believed that she was protesting race or gender discrimination, and that her opposition activity itself was reasonable.  *See Netter v. Barnes*, 908 F.3d 932, 937–38 (4th Cir. 2018).  Such opposition can include pursuing "informal grievance procedures," such as "voicing one's opinions in order to bring attention to an employer's discriminatory activities," *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998), and "complain[ing] to [one's] superiors about suspected violations."  *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003).

The Complaint facts make plausible this element.  On February 1, 2021, Newcomer reported to Young that May had made disparaging remarks to Black and Hispanic employees and put her hands on them in a manner that suggested racial animus.  ECF No. 1 ¶ 103.  And in March 2021, Newcomer reported the same to HR.  *Id.* ¶ 172.  These reports constitute protected activity.

Next, it is indisputable that Newcomer experienced an adverse employment action.  A month after she reported May's conduct to HR, Newcomer was terminated.  *Id.* ¶ 249.  As termination is the ultimate adverse action, it certainly is enough to make plausible the claim.  *See Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 357 (2024).

As to the third element, causation, the close temporal proximity is sufficient to make the claim plausible. *See Campbell v. Becton, Dickinson & Co.*, No. 1:22-CV-03043-ELH, 2024 WL 1299354, at *34 (D. Md. Mar. 27, 2024) (citing *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 335 (4th Cir. 2018)). Because as little as a month separated Newcomer's complaints to HR and her termination, the claims survive dismissal, and the motion as to the retaliation Counts is denied.

### D. EPA Claim (Count VII)

Lastly, the Court turns to Newcomer's EPA claim. To make plausible this cause of action, the Complaint must aver that "(1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." *U.S. Equal Emp. Opportunity Comm'n v. Maryland Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). MOM's contends that the claim fails because she has not identified the necessary comparator for an EPA claim. ECF No. 17 at 14. The Court agrees.

At best, Complaint makes the barebones assertion that even though Newcomer did the same work as Young, she was paid less as an Assistant General Manager than he was as a General Manager. ECF No. 1 ¶¶ 33 & 75. But the Complaint is unclear as to the relative job responsibilities for each position, or on the requisite skill, effort and experience related to either. *See Reece v. Martin Marietta Techs., Inc.*, 914 F. Supp. 1236, 1242 (D. Md. 1995) (citing *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 950 (4th Cir. 1995)). Nor can the Court simply presume that each performed their work under similar working conditions. This is

17

especially so given that Newcomer, as an Assistant Manager was on par with May, not Young. Thus, this claim cannot proceed.

### IV.   Conclusion

In sum, the Complaint fails to state a claim for all causes of action save for the retaliation claims (Counts III & VI). The Court, therefore, grants in part and denies in part MOM's motion to dismiss. ECF No. 11. As to whether dismissal will be with or without prejudice, Newcomer has not previously asked to amend the Complaint, and she should be afforded this opportunity. *See Ostrzenski v. Seigel*, 177 F.3d 245, 252-53 (4th Cir. 1999) (explaining that a district court should not dismiss a complaint with prejudice under Fed. R. Civ. P. 12(b)(6) without first giving the plaintiff leave to amend). Accordingly, within fourteen days from the date of this Opinion and Order, Newcomer may move for leave to file an amended complaint to cure the pleading deficiencies identified in this decision. Failure to so move will result in dismissal of those claims with prejudice and without further notice.

A separate Order follows.

| 3/25/2025 | /S/ |
|---|---|
| Date | Paula Xinis<br>United States District Judge |